## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JAMES P. TESSITORE, individually and on behalf of all others similarly situated,

        Plaintiff,

     v.

CHINA FIRE & SECURITY GROUP, INC., WEIGANG LI, BRIAN LIN, WEISHE ZHANG, GUOYOU ZHANG, YINGQING LI, XIANGHUA LI, ALBERT MCLELLAND, AMBER PARENT LIMITED, AMBER MERGERCO, INC., and BAIN CAPITAL PARTNERS, LLC,

        Defendants.

_____/

CASE NO.

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff, by his undersigned attorneys, for his class action complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.    This is a class action on behalf of the public shareholders of China Fire & Security Group, Inc. ("China Fire" or the "Company") against the Company and its Board of Directors (the "Board," "Directors," or "Individual Defendants") to enjoin a proposed transaction announced on May 20, 2011 (the "Proposed Transaction"), pursuant to which China Fire will be acquired by affiliates of Bain Capital Partners, LLC.

2.    On or about May 20, 2011, the Board caused China Fire to enter into an agreement and plan of merger (the "Merger Agreement") with Amber Parent Limited, an affiliate of funds managed by Bain Capital Partners, LLC, and Amber Mergerco, Inc., a wholly-owned

subsidiary of Amber Parent Limited (collectively, "Bain Capital"), under which each share of the Company's common stock issued and outstanding immediately prior to the effective time of the merger will be cancelled in exchange for the right to receive $9.00 in cash, in a transaction valued at approximately $265.5 million.   Pursuant to the Proposed Transaction, Amber Mergerco, Inc. will merge with and into the Company, with the Company surviving as a wholly-owned subsidiary of Amber Parent Limited.

3.      The Proposed Transaction is particularly troubling in light of the fact that three of the seven Board members—Weigang Li, Chairman of the Company's Board, Brian Lin, the Chief Executive Officer, and Weishe Zhang, Vice President of Strategic Planning of the Company—own approximately 59.14% of the total voting power of the Company and have entered into voting agreements (the "Voting Agreements") pursuant to which they have agreed, among other things, to vote their respective equity securities in the Company in favor of the Merger Agreement and against any alternative proposals, and to grant Amber Parent Limited a proxy to vote such securities.   Furthermore, Weigang Li, Brian Lin, and Weishe Zhang (the "Rollover Defendants") have also entered into a rollover agreement (the "Rollover Agreement"), pursuant to which they will become shareholders in Amber Parent Limited following consummation of the Proposed Transaction—benefits unavailable to plaintiff and the Company's public shareholders.

4.      On June 10, 2011, the Company filed a Schedule 14A Preliminary Proxy Statement (the "Preliminary Proxy") with the United States Securities and Exchange Commission (the "SEC") in connection with the Proposed Transaction.   The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information, thereby rendering the shareholders unable to make an

informed decision on whether to vote in favor of the Proposed Transaction.

5.      The Individual Defendants have breached and will continue to breach their fiduciary duties to plaintiff and the Company's other public shareholders by entering into the Merger Agreement with Bain Capital.   Moreover, the Company and Bain Capital have knowingly aided and abetted the Individual Defendants' breaches of fiduciary duties.  Plaintiff seeks enjoinment of the Proposed Transaction or, alternatively, rescission of the Proposed Transaction in the event defendants are able to consummate it.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t(a); SEC Rule 14a-9, 17 C.F.R. § 240.14a-9; and Florida common law.  This Court has subject matter jurisdiction over the claims made under the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  The Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants, including China Fire, either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint occurred in substantial part in this District.  Finally, the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of approximately 23,450 shares of China Fire common stock.

9.      Defendant China Fire is a Florida corporation with its principal executive offices

located in Beijing, People's Republic of China.  According to its website, China Fire, "through its wholly owned subsidiary, Sureland Industrial Fire Safety Limited ('Sureland'), is a leading total solution provider of industrial fire protection systems in China. . . . China Fire is engaged primarily in the design, manufacture, sales and maintenance services of a broad product portfolio including detectors, controllers, and fire extinguishers."  Its customers include "major companies in iron and steel, power, petrochemical and transportation industries throughout China."  *China Fire & Security Group, Inc*., http://www.chinafiresecurity.com (last visited July 12, 2011). China Fire's shares trade on the NASDAQ under the ticker symbol "CFSG."

10.    The Board consists of seven members, only four of whom are independent.

11.    Defendant Weigang Li ("W. Li") has served as a China Fire director since March 2010 and is currently Chairman of the Board and General Manager of Sureland.  W. Li has also served as the Company's Vice President of Sales since February 2009.  According to the Form 13D/A filed by W. Li with the SEC on March 25, 2011, W. Li beneficially owns approximately 55.9% of China Fire's outstanding common stock.

12.    Defendant Brian Lin ("Lin") is a co-founder of the Company, has served as a China Fire director since October 2006, and currently serves as the Company's Chief Executive Officer.  According to the Company's Annual Proxy Statement filed with the SEC on Form DEF 14A on October 26, 2010 (the "2010 Proxy"), Lin beneficially owns approximately 3.7% of China Fire's outstanding common stock.

13.    Defendant Weishe Zhang ("W. Zhang") has served as a China Fire director since February 2009 and has also served as the Company's Chief Technology Officer since that time. According to the 2010 Proxy, W. Zhang beneficially owns approximately 2.3% of China Fire's outstanding common stock.

14.     Defendant Guoyou Zhang ("G. Zhang") has served as a China Fire director since April 2007.  According to the 2010 Proxy, G. Zhang is Chair of the Company's Compensation Committee and is also a member of the Audit Committee and the Nominating and Corporate Governance Committee.

15.     Defendant Yingqing Li ("Y. Li") has served as a China Fire director since January 2011.  According to a Form 8-K filed with the SEC on January 21, 2011, Y. Li is Chair of the Company's Nominating and Corporate Governance Committee and is also a member of the Compensation Committee.

16.     Defendant Xianghua Li ("X. Li") has served as a China Fire director since September 2008.  According to the 2010 Proxy, X. Li is a member of the Company's Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.

17.     Defendant Albert McLelland ("McLelland") has served as a China Fire director since September 2008.  According to the 2010 Proxy, McLelland is Chair of the Company's Audit Committee.

18.     Defendant Bain Capital Partners, LLC is a Delaware limited liability company with its principal executive offices located in Boston, Massachusetts.  Bain Capital Partners, LLC is a global private investment firm that manages several pools of capital, including private equity, venture capital, public equity, credit products and absolute return, with approximately $65 billion in assets under management.  Since its inception in 1984, the firm has made private equity investments and add-on acquisitions in more than 300 companies worldwide.

19.     Defendant Amber Parent Limited is a company incorporated in the Cayman Islands and is an affiliate of Bain Capital Asia Fund, L.P. and Bain Capital Fund X, L.P., funds

managed by Bain Capital Partners, LLC.

20.    Defendant Amber Mergerco, Inc. is a Florida corporation with its principal office located in Hong Kong.  It is a wholly-owned subsidiary of Amber Parent Limited.

21.    The defendants identified in paragraphs 11 through 17 are collectively referred to herein as the "Individual Defendants."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

22.    The Individual Defendants, as officers, directors, and/or controlling shareholders of a publicly-traded corporation, have a fiduciary relationship with plaintiff and the other public shareholders of China Fire and owe them the highest obligations of good faith, fair dealing, loyalty, due care, and full and candid disclosure, as well as a duty to maximize shareholder value on a sale of the Company.

23.    To comply diligently with their fiduciary duties, the Individual Defendants may not take any action that:

(a)    Adversely affects the value provided to the Company's public shareholders;

(b)    Favors themselves or will discourage or inhibit alternative offers to purchase control of the Company or its assets;

(c)    Contractually prohibits them from complying with their fiduciary duties;

(d)    Will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the Company's public shareholders; and/or

(e)    Will provide them with preferential treatment at the expense of, or separate from, the public shareholders.

24.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of China Fire, are obligated to refrain from:

(a)     Participating in any transaction where their loyalties are divided;

(b)     Participating in any transaction where they receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the Company; and/or

(c)     Unjustly enriching themselves at the expense or to the detriment of the public shareholders.

25.     The Individual Defendants, as directors, officers, and/or controlling shareholders of China Fire, owe plaintiff and the public stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction, and ensuring that all disclosed facts are not materially misleading.

26.     Plaintiff alleges herein that the Individual Defendants knowingly, purposefully, deliberately, willfully, and culpably breached their fiduciary duties to plaintiff and China Fire's public shareholders by committing, causing, permitting to be committed, or ratifying the acts complained of herein.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on his own behalf and as a class action on behalf of the public shareholders of China Fire common stock (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

28.     This action is properly maintainable as a class action.

29.     The Class is so numerous that joinder of all members is impracticable.  According

to the Preliminary Proxy, approximately 28,640,321 shares of China Fire's common stock, held by scores, if not hundreds, of individuals and entities scattered throughout the country, are subject to the Proposed Transaction

30.     There are questions of law and fact that are common to the Class and predominate over questions affecting any individual members of the Class.  These questions include, *inter alia*, the following:

a.     Whether the Preliminary Proxy contains materially false and/or misleading statements and omissions in violation of Section 14(a) of the Exchange Act;

b.     Whether plaintiff and the other members of the Class would be irreparably injured in the absence of injunctive relief requiring defendants to issue additional disclosures to shareholders to render certain of the statements in the Preliminary Proxy complete and otherwise non-misleading;

c.     Whether the Individual Defendants breached the fiduciary duties they owed to the Company's public shareholders; and

d.     Whether China Fire and/or Bain Capital aided and abetted the Individual Defendants in breaching the fiduciary duties they owed to the Company's shareholders.

31.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

32.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the

Class that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

33.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, and final injunctive relief on behalf of the Class as a whole is appropriate.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

A.     **Company Background And China Fire's Strong Financial Performance And Significant Future Growth Prospects**

34.     On March 7, 2011, at 7:00 a.m. EST, China Fire issued a press release in which it announced that a Special Committee of the Board received "a non-binding letter from a leading private equity firm (the 'PE'), pursuant to which the PE proposes to acquire all of the outstanding shares of common stock of China Fire in cash at a price which represents a premium over the current stock price (the 'Proposal')."  The press release did not identify the PE, the price offered in the Proposal, or the purported premium and how it was calculated.

35.     The press release stated that the Special Committee, "which was formed to consider certain potential transactions involving the Company (including the Proposal)," had retained a financial advisor and legal counsel "to assist it in consideration of such matters."  It noted that no decision had been made by the Special Committee regarding the Company's response to the Proposal and that "[t]here can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transaction will be approved or consummated."

36.     The press release also stated that under the Proposal, the PE "is willing to

structure the proposed acquisition to allow the existing members of the Company's management to exchange all or part of their equity interests in the Company into equity securities in the post-acquisition company."

37.     According to a press release issued by the Company on August 9, 2010, regarding its second quarter earnings for 2010:

> [T]he Company's total revenue increased 0.4% year over year to $22.8 million, compared to $22.7 million for the same period in 2009.  This slight increase was primarily attributable to the increase in the Company's revenues from maintenance services, offset by the decrease in the Company's revenue from system contracting projects and product sales.
>
> Revenues from system contracting projects decreased by 0.1% to $18.3 million during the second quarter of 2010, compared to $18.3 million for the same period of last year, while revenues from product sales were $3.6 million during the second quarter of 2010, compared to $3.8 million for the same period of 2009. The decrease in revenues from both system contracting projects and product sales were attributable to the slowdown in the execution of projects from the iron and steel industry, which experienced industry weakness with lower steel selling prices and rising costs of iron ore during the period.
>
> Gross margin for the second quarter of 2010 was 54.3%, compared to a gross margin of 63.8% for the second quarter of 2009. The decrease in the Company's gross margin was mainly due to the lower revenue contribution from iron and steel industry during the period. System contracting projects from the iron and steel industry generally contribute higher gross margins than the projects from other industries, due to a higher percentage of the Company's self-manufactured proprietary products being utilized in the iron and steel projects.
>
> The Company's operating income for the second quarter of 2010 was $7.0 million, compared to $9.6 million for the same period last year. The decrease in the operating income was mainly attributable to the decrease in the Company's gross profit and the increase in the Company's operating expenses during the period.
>
> The Company's GAAP net income for the second quarter of 2010 was $6.3 million, compared to $8.3 million for the same period of 2009, representing an annual decrease of 24.0%. The decrease in net income was mainly due to the decrease in gross profit and increase in operating expenses during the period. As a result, the Company's fully diluted EPS was $0.22 in the second quarter of 2010, versus $0.29 in the second quarter of 2009.

If the non-cash option and restricted stock expenses are excluded, then the Company's non-GAAP net income was $7.4 million during the second quarter of 2010, compared to $8.6 million during the second quarter of 2009, representing an annual decrease of 14.1%. The Company's non-GAAP diluted EPS was $0.26 for the second quarter of 2010, compared to $0.30 for the same period of 2009.

\*                    \*                    \*

As of June 30, 2010, the Company had cash and cash equivalents of $27.8 million, a sequential increase of $2.6 million from $25.1 million at the end of the first quarter of 2010. During the second quarter, the Company generated $2.8 million cash from operations as compared to a positive operating cash flow of $0.4 million in the same period of last year.

\*                    \*                    \*

Based on the Company's current backlog and contract pipeline, for full year 2010, the Company now expects to achieve revenues of $118 million to $125 million, representing an annual top line growth of 45%-54%. The Company estimates that GAAP net income will be in the range of $34 million to $36 million, or EPS of $1.20 to $1.26 based on fully diluted shares outstanding of 28.5 million, representing an annual bottom line growth of 39% - 47%. This is in comparison to the previous targets of revenue of $135 million to $145 million, net income of $47 million to $49 million and EPS of $1.65 to $1.70.

38.     Rollover Defendant Lin stated in the press release that "I am pleased with the progress we have achieved during this quarter, particularly in light of the unexpected softness in the iron and steel vertical. As we continue to build up our backlog, we remain optimistic, having seen significant opportunities and demand for our fire protection total solutions."  He noted further that:

We believe that the current setback within China's iron and steel industry is only a short-term challenge to our business. We find it prudent to revise our 2010 outlook accordingly. We remain fully confident in our ability to grow our business and expand our market share in different verticals. The long-term $2 billion market potential of retrofitting opportunities within the iron and steel industry has not changed, and in our view, we are well-positioned to capture tremendous business opportunities from the industry recovery and from China's industrialization process overall. As such, we believe that China Fire's current stock price level does not reflect the intrinsic value of our Company, and so we intend to actively implement our existing share buy-back plan of $10 million. We are confident that by leveraging our proprietary products, leading brand name and

strong track record, China Fire will continue to gain significant market shares from the iron and steel, power generation, chemical, transportation and international markets.

39.     According to a press release issued by the Company on November 9, 2010,

regarding its third quarter earnings for 2010:

> [T]he Company's total revenues were relatively unchanged at $24.8 million, as compared to the same period in 2009. During this quarter, the Company recognized revenues from 223 total solution, product sales and maintenance contracts as compared to 205 contracts for the same period of 2009. Revenues from system contracting projects increased by 6.2% to $19.9 million derived from 122 contracts during the third quarter of 2010, compared to $18.7 million derived from 101 contracts for the same period of last year. Revenues from product sales were $4.1 million with 47 contracts executed during the third quarter of 2010, compared to $5.4 million with 45 contracts executed for the same period of 2009. Revenues from maintenance service increased by 12.7% to $0.9 million derived from 54 contracts for the third quarter of 2010, compared to $0.8 million derived from 59 contracts for the third quarter of 2009.
>
> Gross margin for the third quarter of 2010 was 50.5%, compared to a gross margin of 56.4% for the third quarter of 2009. The decrease in the Company's gross margin was mainly due to a change in the contract mix during the period.
>
> The Company's operating income for the third quarter of 2010 was $6.8 million, compared to $8.5 million for the same period last year. The decrease in the operating income was mainly attributable to a combination of lower gross profits and higher operating expenses. Correspondingly, GAAP net income for the third quarter of 2010 was $5.9 million, compared to $7.6 million for the same period of 2009, representing an annual decrease of 21.4%. As a result, the Company's fully diluted EPS was $0.20 in the third quarter of 2010, versus $0.27 in the third quarter of 2009.
>
> *                    *                    *
>
> As of September 30, 2010, the Company had cash and cash equivalents of $29.6 million, a sequential increase of $1.8 million from $27.8 million at the end of the second quarter of 2010. During the third quarter, the Company generated $2.6 million cash from operations as compared to cash used by operating activities of $4.6 million in the same period of last year.

40.     Rollover Defendant Lin commented in the press release that:

> In recent months, the iron & steel industry witnessed lower steel prices and, at the same time, a significant increase in production costs. As such, our core customers

– China's mid-to-large iron & steel manufacturers – have experienced a squeeze in profits and cash flows.  In light of this, we have also adopted cautious measures to preserve our cash by slowing some of our ongoing projects in order to control expenditures.

Rollover Defendant Lin added that:

Despite the solid fundamentals underlying our fire protection industry and some modest signs of improvement in the iron and steel industry, a recovery has been much slower than we had expected.  For the immediate future, we believe our core customers will continue to reactively preserve cash and defer spending, and as such, we view it prudent that we withdraw our business outlook at this time. Having said that, while we await the eventual recovery in the iron & steel vertical, *we are committed to expand our competitive advantages and sustain our position as the leading total solution provider of industrial fire protection systems in China.*

(Emphasis added).

41.     On March 16, 2011, China Fire issued a press release wherein it announced its fourth quarter and full-year 2010 financial results.  Although the Company reported decreased revenues, it also emphasized the following highlights:

- As of December 31, the Company had a backlog valued at $151.3 million;

- In February, CFSG signed a $92 million contract with Wuhan Iron and Steel;

- In July, the Company won a $10 million contract with China Nuclear Power;

- In the end of December, the Company received preliminary contract win notice of $8.2 million from Beijing Infrastructure Investment Co., the Company's first contract win in China's Subway industry; and

- The Company also successfully enriched its product portfolio, including infrared and ultraviolet composite flame detectors, electric fire monitoring systems and high-pressure water mist fire-extinguishing systems.

42.     Rollover Defendant Lin commented in the press release that:

In spite of lower than expected revenue in the fourth quarter and the full year of 2010, I am satisfied with our business momentum and with the groundwork that we laid out over the past year.  In 2010, we have signed over $170 million worth of new contracts -- *a new record in [C]ompany's history.*  In addition to our continuous success in iron and steel industry, we have made significant progress

13

in nuclear power sector, transportation sector and international markets. ***We have demonstrated our capabilities in penetrating into new industrial verticals by leveraging our strong brand name, excellent technical expertise and project management track records.*** However, the nature of our business as a total solution provider may occasionally depend on the profitability and cash position of our major customers, thereby impacting our revenue and consequently our quarterly and annual financial results. ***With strong visibility from the $151 million backlog and our more diversified customer base, China Fire's management team continues to be excited with our growth prospects in our core iron and steel market and other industrial sectors.***

(Emphasis added).

43.     At no time prior to March 7, 2011, had China Fire or any Individual Defendant made any public disclosure that the Company was considering strategic alternatives, was being offered for sale, or had conducted discussions with any parties concerning such a sale. The Company's recent financial results demonstrate that China Fire is not facing a liquidity crisis and has no other compelling reason to arrange for a sale of the Company at this time.

**B.     The Proposed Transaction**

44.     On May 20, 2011, China Fire issued a press release announcing the Proposed Transaction with Bain Capital. On May 23, 2011, China Fire filed a Form DEFA14A with the SEC, attaching as Exhibit 2.1 the Merger Agreement.

45.     The Board, acting upon the unanimous recommendation of the Special Committee formed by the Board, approved the Merger Agreement and resolved to recommend that the Company's shareholders vote to adopt the Merger Agreement.

46.     Pursuant to the Merger Agreement, each share of the Company's common stock issued and outstanding immediately prior to the effective time of the merger will be cancelled in exchange for the right to receive $9.00 in cash, except for (i) shares beneficially owned by the Company, any subsidiary of the Company, Amber Parent Limited, or Amber Mergerco, Inc., including shares to be contributed to Amber Parent Limited or Amber Mergerco, Inc. pursuant to

the Rollover Agreement, and (ii) shares held by shareholders who have properly exercised appraisal rights.

47.    In connection with the Proposed Transaction, Rollover Defendants W. Li, Lin, and W. Zhang entered into the Voting Agreements, pursuant to which they agreed, among other things, to vote their securities in the Company—constituting approximately 59.14% of the total voting power of the Company—in favor of the Merger Agreement and against any alternative proposals.  The Rollover Defendants further agreed to grant Amber Parent Limited a proxy to vote their securities and agreed not to solicit, encourage and, except in limited circumstances, engage or participate in discussions relating to alternative acquisition proposals from third parties.  According to Section 1.1 of the Voting Agreements:

> From and after the date hereof until the earlier of (a) the Effective Time and (b) the termination of the Merger Agreement pursuant to and in compliance with the terms therein (such earlier time, the "Expiration Time"), the Shareholder irrevocably and unconditionally hereby agrees that at any meeting (whether annual or special and each adjourned or postponed meeting) of the Company's shareholders, however called, or in connection with any written consent of the Company's shareholders, the Shareholder shall (i) appear at such meeting or otherwise cause its Securities to be counted as present thereat for purposes of determining whether a quorum is present and (ii) vote or cause to be voted (including by proxy or written consent, if applicable) all of the Shareholder's Securities, without regard to any Company Adverse Recommendation Change, (a) for approval and adoption of the Merger Agreement and the transactions contemplated by the Merger Agreement, (b) against any Acquisition Proposal, without regard to the terms of such Acquisition Proposal, or any other transaction, proposal, agreement or action made in opposition to approval and adoption of the Merger Agreement or in competition or inconsistent with the Merger and the other transactions contemplated by the Merger Agreement, (c) against any other action, agreement or transaction that is intended, that could reasonably be expected, or the effect of which could reasonably be expected, to materially impede, interfere with, delay, postpone, discourage or adversely affect the Merger or any of the other transactions contemplated by the Merger Agreement or this Agreement or the performance by the Shareholder of its obligations under this Agreement, including, without limitation: (i) any extraordinary corporate transaction, such as a merger, consolidation or other business combination involving the Company or any Company Subsidiary (other than the Merger); (ii) a sale, lease or transfer of a material amount of assets of the Company or any

Company Subsidiary or a reorganization, recapitalization or liquidation of the Company or any Company Subsidiary; (iii) an election of new members to the board of directors of the Company, other than nominees to the board of directors of the Company who are serving as directors of the Company on the date of this Agreement or as otherwise provided in the Merger Agreement; (iv) any material change in the present capitalization or dividend policy of the Company or any amendment or other change to the Company's articles of incorporation or bylaws, except if approved in writing by Parent; (v) any action that would require the consent of Parent pursuant to Section 6.1 of the Merger Agreement, except if approved in writing by Parent; or (vi) any other material change in the Company's corporate structure or business, except if approved in writing by Parent, (d) against any action, proposal, transaction or agreement that would reasonably be expected to result in a breach in any respect of any covenant, representation or warranty or any other obligation or agreement of the Company contained in the Merger Agreement, or of the Shareholder contained in this Agreement, and (e) in favor of any other matter necessary to the consummation of the transactions contemplated by the Merger Agreement.

48.    Furthermore, Section 2.1(a) of the Voting Agreements states:

(a) Prior to the Expiration Time, the Shareholder in its capacity as a shareholder of the Company shall not, and shall use its reasonable best efforts to cause its officers, directors, employees, agents, advisors and other representatives (in each case, acting in their capacity as such to the Shareholder, in its capacity as a shareholder (the "Shareholder's Representatives")) not to, directly or indirectly: (a) initiate, solicit, propose, encourage or knowingly facilitate (including by providing information) any inquiries, proposals or offers with respect to, or the making or completion of, an Acquisition Proposal or offer that would reasonably be expected to lead to an Acquisition Proposal, (b) engage, continue or participate in any negotiations concerning, or provide or cause to be provided any non-public information or data relating to the Company or any Company Subsidiary in connection with, or have any discussions (other than to state that they are not permitted to have discussions) with any Person relating to, an actual or proposed Acquisition Proposal or offer that would reasonably be expected to lead to an Acquisition Proposal, or otherwise knowingly facilitate any effort or attempt to make or implement an Acquisition Proposal or offer that would reasonably be expected to lead to an Acquisition Proposal, (c) to the extent permitted by applicable Law, grant any waiver, amendment or release under any standstill or confidentiality agreement or Takeover Statutes, or otherwise knowingly facilitate any effort or attempt by any person to make an Acquisition Proposal (including providing consent or authorization to make an Acquisition Proposal to any officer or employee of the Company or to the Company Board (or any member thereof) pursuant to any confidentiality agreement entered into prior to the date hereof), (d) approve, endorse or recommend, or propose to approve, endorse or recommend, or execute or enter into, any letter of intent, agreement in principle, merger agreement, acquisition agreement, option agreement or other similar

agreement relating to any Acquisition Proposal or offer that would reasonably be expected to lead to an Acquisition Proposal, or (e) resolve to propose or agree to do any of the foregoing (the activities specified in clauses (a) through (e) being hereinafter referred to as the "Restricted Activities").

49.     Rollover Defendants W. Li, Lin, and W. Zhang also entered into the Rollover Agreement, pursuant to which they will become shareholders in the post-transaction entity following consummation of the Proposed Transaction.  The Rollover Defendants agreed that each Rollover Defendant would contribute a portion of the Company shares owned by them, which amount to approximately 20.5% of the Company's shares, in exchange for equity interests of Amber Parent Limited.  Furthermore, Li Brothers Holdings Inc., which is related to Rollover Defendant W. Li, agreed to contribute an additional portion of the Company's shares owned by it, representing 4.4% of the Company's shares, to Amber Mergerco, Inc.

50.     The Individual Defendants have breached their fiduciary duties because, *inter alia*, the Rollover Defendants will receive benefits that are not available to plaintiff or the other public holders of China Fire shares.  The Rollover Defendants are improperly motivated to approve the Merger Agreement by their own potential financial gain to the detriment of plaintiff and the Class.  As noted in The Motley Fool, there are "concern[s] that management won't fight for the best price for shareholders."  Mark Koppenheffer, *China Fire & Security Shares Popped: What You Need to Know*, The Motley Fool (Mar. 7, 2011), http://www.fool.com/investing/general/2011/03/07/china-fire-security-shares-popped-what-you-need-to.aspx.

51.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of China Fire is materially in excess of the amount offered in the Proposed Transaction.  China Fire's shares closed as high as $14.60 as recently as May 14, 2010.  It is apparent that the Individual

Defendants are seeking to shed the Company's public shareholders at a time when the Company's stock price is temporarily depressed, in contravention of their fiduciary duties.

52.     The Proposed Transaction will deny plaintiff and the Class members their right to share proportionately and equitably in the true value of the Company's ongoing and valuable business, as well as its future growth in profits and earnings, at a time when the Company is poised for continued growth.

53.     As a result of the acts described herein, the Individual Defendants have breached the fiduciary duties they owe to the Company's public shareholders because the shareholders will not receive adequate or fair value for their China Fire shares in the Proposed Transaction.

54.     Moreover, to the detriment of the Company's shareholders, the terms of the Merger Agreement substantially favor Bain Capital and are calculated to unreasonably dissuade potential suitors from making competing offers.

55.     Although the Merger Agreement provides for a 55-day "Go Shop" Period, that period is insufficient to allow a meaningful period for due diligence and the presentation of a superior proposal.  Moreover, at the conclusion of the Go-Shop Period, the Company may continue in discussions with only those parties that meet the strict definition of being considered a "Continuing Party" and only until the last day of the 15-day period following the expiration of the Go-Shop Period.  The Merger Agreement defines a Continuing Party as follows:

> "Continuing Party" shall mean any Person or group (other than Parent or Merger Sub) (i) from whom the Company has received, after the date of this Agreement and prior to the Solicitation Period End Date, (x) a written Acquisition Proposal that the Special Committee determines, as of the Solicitation Period End Date, in good faith (after consultation with its independent financial advisor and outside legal counsel) is bona fide and would reasonably be expected to result in a Superior Proposal and (y) a written representation by such Person or group to the effect that such Person and the other members of such group, if any, who were members of such group immediately prior to the Solicitation Period End Date will provide at least 50% of the equity financing (measured by both voting power and

value) to be provided by such group at all times from the date of the making of the Acquisition Proposal through the consummation of the Acquisition Proposal, and (ii) is engaged in good faith discussions with the Company with respect to such Acquisition Proposal immediately prior to the Solicitation Period End Date.

### C.   Preclusive Deal Protection Devices Prevent Proper Negotiations With Competing Bidders

56.   Otherwise, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "No Solicitation" provision in Section 6.4 of the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 6.4(b) of the Merger Agreement states:

> (b) Except as expressly permitted by this Section 6.4, the Company and its officers and directors shall, and the Company shall instruct the Company Subsidiaries and Company Representatives to, immediately after the Solicitation Period End Date (or, as may relate to any Continuing Party, immediately after the Cut-Off Date): (i) cease all discussions and negotiations with any Persons that may be ongoing with respect to an Acquisition Proposal and deliver a written notice to each such Person to the effect that the Company is ending all discussions and negotiations with such Person with respect to any Acquisition Proposal, and the notice shall also request such Person to promptly return or destroy all confidential information concerning the Company and the Company Subsidiaries; and (ii) until the Effective Time or, if earlier, the termination of this Agreement in accordance with Article VIII, not: (A) initiate, solicit, propose, knowingly encourage (including by providing non-public information) or knowingly facilitate any inquiries or the making of any proposal or offer that constitutes, or may reasonably be expected to lead to, an Acquisition Proposal; (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information or data concerning the Company or any Company Subsidiary to any Person relating to, any Acquisition Proposal, or any proposal or offer that could reasonably be expected to lead to an Acquisition Proposal; (C) grant any waiver, amendment or release under any standstill or confidentiality agreement or Takeover Statutes; (D) approve, endorse, recommend, execute or enter into any letter of intent, agreement in principle, merger agreement, acquisition agreement or other similar agreement (other than an Acceptable Confidentiality Agreement) relating to an Acquisition Proposal or any proposal or offer that could reasonably be expected to lead to an Acquisition Proposal, or that requires the Company to abandon this Agreement or the Merger;

or (E) resolve, agree or publicly announce an intention to do any of the foregoing.

57.     The Merger Agreement requires the Company to keep Bain Capital apprised of any potential third party interest within forty-eight hours of receiving such interest and provide Bain Capital with, among other things, the identify of such third party.  Section 6.4(g) of the Merger Agreement states:

> (g) After the Solicitation Period End Date, the Company agrees that it will promptly (and, in any event, within 48 hours) notify Parent if any Acquisition Proposals are received by, any non-public information is requested from, or any discussions or negotiations are sought to be initiated or continued with, the Company, the Company Board, the Special Committee or any Company Representative indicating, in connection with such notice, the identity of the Person or group of Persons making such offer or proposal, the material terms and conditions of any proposals or offers and thereafter shall keep Parent reasonably informed, on a prompt basis (in any event, within 48 hours), of the status and terms of any such proposals or offers (including any amendments thereto that are material in any respect) and the status of any such discussions or negotiations, including any change in the Company's intentions as previously notified.  None of the Company, the Company Board or any committee of the Company Board shall enter into any binding agreement or Contract with any Person to limit or not to give prior notice to Parent of its intention to effect a Company Adverse Recommendation Change or to terminate this Agreement in light of a Superior Proposal.

The Merger Agreement provides a "fiduciary out" providing that the Individual Defendants can cause China Fire to pursue an alternative transaction.  Other sections of the Merger Agreement, however, render this "fiduciary out" provision meaningless.  For example, Section 6.4 states that China Fire must notify Bain Capital of any proposals, offers, or any overtures of interest from other potential suitors.  Section 6.4(d) of the Merger Agreement states:

> (d) Except as expressly provided by Section 6.4(e), neither the Company Board nor any committee thereof shall: (i) (A) withhold, withdraw, qualify or modify (or publicly propose or resolve to withhold, withdraw, qualify or modify), in a manner adverse to Parent or Merger Sub, the Company Recommendation with respect to the Merger, (B) adopt, approve or recommend or propose to adopt, approve or recommend (publicly or otherwise) an Acquisition Proposal, (C) publicly take, disclose a position with regard to or issue any statement referencing an Acquisition Proposal (other than a "stop, look and listen" communication of the type contemplated by Rule 14d-9(f) under the Exchange Act or a statement

20

that the Company Board has received and is currently evaluating such Acquisition Proposal) that is not an express rejection of any applicable Acquisition Proposal or an express reaffirmation of its recommendation in favor of the transactions contemplated by this Agreement, (D) fail to include the Company Recommendation in the Proxy Statement or (E) cause or permit the Company or any Company Subsidiary to enter into any letter of intent, memorandum of understanding or similar document or Contract relating to any Acquisition Proposal (other than any Acceptable Confidentiality Agreement entered into in accordance with  Section 6.4(a)  or  Section 6.4(c)) (any action described in clauses (A) through (E), a "Company Adverse Recommendation Change"); or (ii) cause or permit the Company or any Company Subsidiary to enter into any acquisition agreement, merger agreement or other similar definitive agreement relating to any Acquisition Proposal (an "Alternative Acquisition Agreement").

Furthermore, Section 6.4 of the Merger Agreement also gives Bain Capital a "match right" with respect to any potential "Superior Proposal" that is made to the Company.  Section 6.4(e)(ii) states in relevant part:

(ii) prior to effecting a Company Adverse Recommendation Change or terminating this Agreement to enter into an Alternative Acquisition Agreement in accordance with  Section 6.4(e)(y), (A) the Company shall have provided prior written notice to Parent at least five (5) Business Days in advance (the "Superior Proposal Notice Period"), to the effect that the Company has received an Acquisition Proposal that is not withdrawn and that the Special Committee concludes in good faith constitutes a Superior Proposal and, absent any revision to the terms and conditions of this Agreement, the Special Committee has resolved to effect a Company Adverse Recommendation Change and/or to terminate this Agreement pursuant to  Section 8.1(c)(iv), which notice shall specify the identity of the party making the Superior Proposal, the material terms thereof and copies of all relevant documents relating to such Superior Proposal, and (B) *the Company shall, and shall cause its financial and legal advisors to, during the Superior Proposal Notice Period, (1) negotiate with Parent and the Parent Representatives in good faith (to the extent Parent desires to negotiate) to make such adjustments in the terms and conditions of this Agreement, so that such Acquisition Proposal would cease to constitute a Superior Proposal, and (2) permit Parent and the Parent Representatives to make a presentation to the Company Board and the Special Committee regarding this Agreement and any adjustments with respect thereto (to the extent Parent desires to make such presentation)*; provided  that in the event of any material revisions to the Acquisition Proposal that the Company Board has determined to be a Superior Proposal, the Company shall deliver a new written notice to Parent and to comply with the requirements of this Section 6.4 (including  Section 6.4(e)) with respect to such new written notice;  provided   further, that references to the five (5)

Business Day period above shall be deemed to be references to a two (2) Business Day period[.] . . .

(Emphasis added).

58.     Further locking up control of the Company in favor of Bain Capital is Section 8.2 of the Merger Agreement, which requires payment of a "Termination Fee" of $8.5 million or $6.4 million, depending on whether the Merger Agreement is terminated after or during the Go-Shop Period, respectively.  The Termination Fee is payable by the Company to Bain Capital if, among other things, the Individual Defendants cause the Company to terminate the Merger Agreement pursuant to the lawful exercise of their fiduciary duties.

59.     These acts, combined with other defensive measures the Company has in place, effectively preclude any other bidders that might be interested in paying more for the Company from taking their bids directly to the Company's owners—its shareholders—and allowing those shareholders to decide for themselves whether they would prefer higher offers to the Proposed Transaction.

**D.     The Materially Misleading and Incomplete Preliminary Proxy Statement**

60.     On June 10, 2011, the Company filed the Preliminary Proxy with the SEC in connection with the Proposed Transaction.

61.     The Preliminary Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

62.     Specifically, the Preliminary Proxy is materially misleading in that it fails to disclose the nature and details of any conversations between Bain Capital, on one hand, and any of the members of the Company's senior management, on the other, concerning employment by

China Fire or Bain Capital following the consummation of the Proposed Transaction.

63.     The Preliminary Proxy is materially misleading in that it fails to disclose any details concerning the circumstances surrounding the engagement of Barclays Capital Asia Limited ("Barclays Capital") or the consideration of any other potential financial advisor.  The Preliminary Proxy similarly fails to disclose any information concerning the relationship between Barclays Capital, on one hand, and Bain Capital and its principals, on the other, and whether Barclays Capital anticipates continued work from China Fire, Bain Capital, or both.  This information is material to shareholders considering whether to rely, in whole or in part, on any of the analyses conducted by the Board's financial advisor in light of potential conflicts.  As such, the Preliminary Proxy must disclose the specific services Barclays Capital has provided to both the Company and Bain Capital over the last five (5) years, and how much compensation has been paid in connection with those services.

64.     The Preliminary Proxy is materially misleading in that it fails to disclose any information concerning the Special Committee's decision to retain the same legal and financial advisors originally hired by the Company's Board, whether any members of the Special Committee expressed any concern, in words or in substance, about a potential conflict regarding the retention of advisors previously engaged by the Company, and any efforts to interview or consider other potential advisors.  Again, this information is material because it addresses questions about the independence of the Special Committee's advisors – advisors that previously had been retained by some of the same managers that are now set to take the Company private.

65.     The Preliminary Proxy is materially misleading in that it fails to provide any details regarding the fees and expenses being paid to Barclays Capital other than that the financial advisor will receive a "customary fee."  The Preliminary Proxy similarly fails to

disclose how much of that fee, if any, was contingent upon delivery of a fairness opinion or consummation of a transaction. This information is material because it goes directly to Barclays Capital's credibility in providing unbiased analyses underlying a fairness opinion upon which shareholders ultimately will be asked to rely.

66.     The Preliminary Proxy fails to disclose the free cash flow projections for the Company in connection with the financial forecasts used by Barclays Capital for purposes of its Discounted Cash Flow Analysis. The omission of this information renders the Preliminary Proxy materially misleading. Under such circumstances, shareholders are entitled to the disclosure of the free cash flows because they have no ability to replicate management's inside view of the Company's prospects. Bain Capital and the Company's Board are asking China Fire's shareholders to tender their shares and accept cash in the near-term in exchange for forsaking an interest in the Company's future cash flows. As such, it is material to the Company's stockholders to know what management and the Company's financial advisor's best estimate of those future cash flows would be.

67.     The recitation of facts in the Preliminary Proxy concerning the events leading up to the execution of the Merger Agreement omits numerous pieces of material information that leaves shareholders wondering whether the Special Committee, in fact, was interested in a process that was even reasonably designed to maximize shareholder value. Particularly, the Preliminary Proxy fails to disclose:

a.     The circumstances surrounding Bain Capital's initial approach to management in January of 2010 and the substance of any discussions or negotiations with Bain Capital at that time;

b.      The reasons that the Company formed a Special Committee at a time when it had only received indications of interest from third parties and there is no disclosure regarding a potential going-private transaction involving management;

c.      The circumstances surrounding Party A contacting the Company in August 2010 and the substance of any discussions or negotiations with Party A at that time;

d.      The terms proposed by Party A in the term sheet submitted to the Company on October 8, 2010;

e.      The details concerning the limited "market check" conducted on behalf of the Special Committee beginning in October 2010, including how the potential buyers were selected and whether any likely potential buyers were excluded from consideration and why;

f.      The terms proposed by Party A in the revised term sheet submitted to the Company on October 20, 2010;

g.      The circumstances surrounding and reasons for the December 6, 2010 in-person meeting between Barclays Capital and Bain Capital;

h.      The circumstances surrounding the Special Committee's repeated determinations to engage in exclusive negotiations with Bain Capital at a time when it appeared that it was neither necessary nor advantageous to do so, and whether the Special Committee attempted to obtain any concessions from Bain Capital in exchange for exclusive negotiations;

i.      The steps, if any, actually taken by the Special Committee and its advisors to investigate Party A's source of financing for an acquisition of the Company; and

j.      The reasons that the Special Committee believed that Party A was required to offer a price with a "material premium" over Bain Capital's proposal before the Special Committee could select Party A's transaction when there was no Merger Agreement with

Bain Capital and the Special Committee had an obligation to maximize value for the Company's shareholders.

68.     The Preliminary Proxy also is materially misleading in that it fails to provide any meaningful discussion about other potential buyers that expressed interest in the Company.  For example, according to the presentation materials prepared by Barclays Capital for the Special Committee's May 18, 2011 meeting to consider whether to approve the Merger Agreement (the "Barclays Book"), an entity described as "Buyer C" made an indicative offer of $13 per share on August 3, 2010.  The Preliminary Proxy fails, however, to provide any information regarding this buyer, or why the Company chose (according to the Barclays Book) to discontinue discussions with Buyer C when the price that it had indicated was materially in excess of the consideration agreed to in the Proposed Transaction.

69.     Similarly, the Barclays Book lists "Buyer E" as having made an indicative offer to buy the Company for $11.40 per share on or around November 22, 2010 and "Buyer F" as having made an indicative offer to buy the Company for somewhere between $8.40 per share to $9.05 per share per share on or around November 23, 2010.  As with Buyer C, the Preliminary Proxy fails to provide any information about these buyers, the fact or details of their bids, or why discussions concerning a potential acquisition of the Company were terminated.   This information is material to shareholders who have a right to understand and be satisfied that the Special Committee took all steps reasonably available on a chance of control to maximize shareholder value.

70.     The Preliminary Proxy reflects that the Special Committee's financial advisors are in the process of conducting a "go shop" to solicit alternative proposals.  The Preliminary Proxy is materially misleading, however, in that it fails to provide sufficient details concerning the

efforts taken by Barclays Capital to assist the Special Committee in maximizing shareholder value.  Particularly, the Preliminary Proxy is devoid of any information regarding the details of the efforts of Barclays Capital to even contact other potential strategic or financial buyers to see if they will top the current price agreed to in the Merger Agreement.  The Preliminary Proxy also fails adequately to address the Special Committee's deliberative process in determining that a post-signing market check would be at all meaningful in light of the clear preference of management to participate in a transaction with Bain Capital in which management will be allowed to continue with the Company, unlike the Company's other, public shareholders.

71.     The summary of Barclays Capital's Discounted Cash Flow Analysis in the Preliminary Proxy is materially misleading in that it fails to disclose sufficient material information to allow shareholders to understand many of the key assumptions that the Special Committee's financial advisors made in opining that the Proposed Transaction was fair to the Company's minority shareholders from a financial point of view.  For example, the Preliminary Proxy fails to disclose:

a.     Why stock-based compensation was only added back for years 2011-2013, and not 2014 and 2015;

b.     The justification for the abnormally large increase in working capital for 2012; and

c.     The nature and identity of the "net other assets" included for purposes of this analysis.

72.     Each of these items is particularly material to shareholders because of the implications that they have on the implied range of value in the Discounted Cash Flow Analysis in that the implication to be drawn from each is that Barclays Capital may have been trying to

skew the implied range of value derived from this analysis downward, in favor of the price being offered in the Proposed Transaction.  Without adequate disclosure, shareholders will never be able to make a fully informed decision on whether to vote in favor of the Proposed Transaction.

73.    Accordingly, plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## COUNT I

### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### (Against China Fire and the Individual Defendants)

74.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against China Fire and the Individual Defendants.

75.    Defendants have issued the Preliminary Proxy with the intention of soliciting shareholder support of the Proposed Acquisition.

76.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that a proxy statement shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

77.    Specifically, the Preliminary Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, defendants should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

78.    The misrepresentations and omissions in the Preliminary Proxy are material to plaintiff and the Class, and plaintiff and the Class will be deprived of their entitlement to cast a

fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

79.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

80.     The Individual Defendants acted as controlling persons of China Fire within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions with the Company, participation in and/or awareness of the Company's finances and operations, and/or participation in and/or knowledge of the negotiations, recommendation of, and approval of the Proposed Transaction of China Fire by Bain Capital, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the Preliminary Proxy which the plaintiff contends contained misleading statements of material fact and omitted material facts that were necessary to render them not misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's internal books and records, reports, financial information, plans, projections, forecasts, and other data not available to its shareholders prior to and after the Preliminary Proxy was issued and had the ability to prevent the issuance of the Preliminary Proxy or cause the Preliminary Proxy to be corrected or updated.

81.     As set forth above, China Fire and the Individual Defendants each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged in this complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with the sale of China Fire to Bain Capital.

**COUNT III**

**Breach of Fiduciary Duty**
**(Against the Individual Defendants)**

82.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

83.     As members of the Company's Board, the Individual Defendants have fiduciary obligations to: (a) undertake an appropriate evaluation of China Fire's net worth as a merger/acquisition candidate; (b) take all appropriate steps to enhance China Fire's value and attractiveness as a merger/acquisition candidate; (c) act independently to protect the interests of the Company's public shareholders; (d) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of China Fire's public shareholders; (e) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of China Fire; and (f) disclose all material information in soliciting shareholder approval of the Proposed Transaction.

84.     The Individual Defendants have breached their fiduciary duties to plaintiff and the Class.

85.     As alleged herein, defendants have initiated a process to sell China Fire that undervalues the Company and vests them with benefits that are not shared equally by China Fire's public shareholders – a clear effort to take advantage of the temporary depression in China Fire's stock price caused by the current economic conditions.  In addition, by agreeing to the

Proposed Transaction, defendants have capped the price of China Fire at a price that does not adequately reflect the Company's true value.  Defendants also failed to sufficiently inform themselves of China Fire's value, or disregarded the true value of the Company, in an effort to benefit themselves.  Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and Board that is committed to the Proposed Transaction.

86.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to plaintiff and the other members of the Class, and will further a process that inhibits the maximization of shareholder value.

87.     Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

**Breach of the Fiduciary Duty of Disclosure**
**(Against the Individual Defendants)**

88.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

89.     Defendants have already caused materially misleading and incomplete information to be disseminated to the Company's public shareholders.  Defendants have an obligation to be complete and accurate in their disclosures.

90.     The Preliminary Proxy fails to disclose material information, including financial information and information necessary to prevent the statements contained therein from being misleading.

91.     The misleading omissions and disclosures by defendants concerning information and analyses presented to and considered by the Board and its advisors affirm the inadequacy of disclosures to the Company's shareholders.  Because of defendants' failure to provide full and fair disclosure, plaintiff and the Class will be stripped of their ability to make an informed

decision on whether to vote in favor of the Proposed Transaction, and thus are damaged thereby.

92.    Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT V

### Aiding and Abetting the Board's Breaches of Fiduciary Duty
### (Against China Fire and Bain Capital)

93.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against China Fire and Bain Capital.

94.    Defendants China Fire and Bain Capital knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.  In connection with discussions regarding the Proposed Transaction, China Fire provided, and Bain Capital obtained, sensitive non-public information concerning China Fire's operations and thus had unfair advantages which enable it to acquire the Company at an unfair and inadequate price.

95.    As a result of this conduct, plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their China Fire shares.

96.    Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff demands relief, in his favor and in favor of the Class, and against the defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action, certifying plaintiff as a Class representative, and appointing plaintiff's counsel as Class counsel;

B.      Declaring that the Preliminary Proxy contained misleading statements of material fact and omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and that China Fire and the Individual Defendants violated said provisions;

C.      Declaring that the Individual Defendants were controlling persons of China Fire within the meaning of Section 20(a) of the Exchange Act and that they violated said provision by their acts and failures to act that resulted in the above-described violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

D.      Declaring that the Individual Defendants breached their fiduciary duties to disclose fully and fairly all material information within the Board's control in seeking shareholder approval of the Proposed Transaction;

E.      Declaring that the Individual Defendants breached their fiduciary duties of good faith, trust, and loyalty in seeking shareholder approval of the Proposed Transaction despite its lack of fairness to the common shareholders;

F.      Declaring that China Fire and Bain Capital knowingly aided and abetted the Individual Defendants in breaching their fiduciary duties;

G.      Enjoining the Proposed Transaction or rescinding the Proposed Transaction if it is consummated;

H.      Directing that defendants pay to plaintiff and the other members of the Class all damages caused to them and account for all profits and any special benefits obtained as a result of their wrongful conduct;

I.      Awarding plaintiff the costs and disbursements of this action, including a reasonable allowance for plaintiff's attorneys' and experts' fees; and

J.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: July 15, 2011                      Respectfully submitted,

                                          By:  /s/ Steven Jaffe

                                          **FARMER, JAFFE, WEISSING, et al.**
                                          Steven R. Jaffe, Esq. (FBN 390770)
                                          Mark S. Fistos, Esq. (FBN 909191)
                                          425 N. Andrews Ave., Suite 2
                                          Fort Lauderdale, Florida 33301
                                          Telephone 954-524-2820
                                          Facsimile 954-524-2822
                                          steve@pathtojustice.com
                                          mark@pathtojustice.com


OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
919 N. Market Street, Suite 980
Wilmington, DE  19801
Tel.: (302) 295-5310
Fax: (302) 654-7530

**RIGRODSKY & LONG, P.A.**
Timothy J. MacFall
Scott J. Farrell
585 Stewart Avenue, Suite 304
Garden City, NY  11530
Tel.:  (516) 683-3516
Fax:  (302) 654-7530